Good morning. It is the case of Moon v. Tall Tree Administrators, 18-4034. Good morning, your honors, and may it please the court. It really is a privilege for me to stand here. My name is Brent Newton and I am representing Wendy She's here for a simple purpose and that's to see if this court will agree with us and ultimately conclude that she should have coverage for the medical treatment that she received and that Tall Tree and Mountain View are the responsible parties to cover that. But to answer that question, there are two things that I anticipate doing today, and if I can do one of them, it will be great. If I can do both, that'll be fantastic. One is I have a presentation of ideas that I think will help you make this decision. The second one though is to answer your questions, and if I can do, like I said, one or both of those, I will have succeeded in what I came here to do. To begin, I would like to begin with the first two words that I utter here today. Good morning. Talk about two words with ambiguity. Good morning. Is it? I don't know. There are a lot of people in this courtroom right now. Some might be nervous, some might not be. Some might not have had a very good morning at all. Maybe the response fine to the question, how are you, is the only spoken word with more ambiguity. What is ambiguous? Let's cut to the chase here. I mean, it says we do not provide coverage for surrogate motherhood, or not necessarily those precise words, but close enough for government work, right? I am delighted that you asked that. Good, good. I don't see why you're delighted, because I've got real problems with your case, but fine. It's okay to be delighted. In bold purple letters, I wrote, what is ambiguity? That was one of the questions I wanted. What is surrogate motherhood? Why don't we start there before we start with, before we start with whether something is ambiguous, why don't we start with what words we're talking about? Okay. Well, the terms of the plan are not specified as covered. Non-traditional medical services, treatments and supplies, which are not specified as covered under this plan, including but not limited to pregnancy charges, acting as a surrogate mother. You asked two questions, John. The first was what is ambiguity? The second one was, what are the words we're talking about? What is a surrogate mother? So medical charges incurred, read that phrase. I will read the phrase again. Non-traditional medical services. Oh no, I meant the surrogate motherhood. Okay. Charges acting as a surrogate mother. Okay. Okay. That's the actual phrase. It's on page 11 of our opening brief, but it's also on, I think it's 543. Charges acting as a surrogate mother. If we're going to read the charges paid or charged by the woman to somebody for acting as a surrogate would be paid by whomever the punitive father is, correct? Well, that's an option if the exclusion applies and if she was acting as a surrogate mother in this context and the treatment was limited to that. So the first question is this, what is a natural mother and a surrogate mother? The charges- Yeah, medical charges incurred for delivering a child as a natural mother- The treatment's the same- Whether in some type of relationship, but we won't be moralistic here, just whether it's either in a traditional marriage or whatever. And the medical fees incurred by a woman who is being paid to be a surrogate or who is volunteering to act as a surrogate. Aren't they one and the same? Yeah. If I understand your question, to the best of my knowledge, my wife has never acted as a surrogate. She had an incurred, she received pregnancy treatment and she received, there were charges for that. A surrogate, a mother, a woman who's acting as a surrogate goes in and if it's a similar pregnancy, the treatment would be the same, the charges would be the same. So getting back to the original question of what is a surrogate mother, first of all, the plan doesn't define that. So I would this court to simply apply what a reasonable person would define as a surrogate mother, and that is someone who's having a child who does not plan to raise that child herself. And there are a multitude of reasons and ways. And in one of, in our opening brief below, not in this action, in the appellant's brief, we actually argued that one of the problems that a surrogate mother wouldn't apply. And that becomes problematic because especially in ERISA-governed insurance cases, insurers have a very interesting benefit. Because if they have discretionary authority, they don't even have to give the best reason why they're denying something. They can go all the way down to the spectrum on any reason. Well, let's say we take whatever standard of review is most favorable to the claimant. Okay. On paragraph 31, what does the phrase, including but not limited to pregnancy charges acting as a surrogate mother, add to the meaning in light of your interpretation? Okay. In terms of that interpretation, it adds two things. If I believe you go to page 541 or 542 of the record, and you look over the next two or three pages, there are a list of exclusions that are identified. Impotence, infertility, sex change operations might be in there. What isn't listed in there is surrogacy, right? So what that tells me is that there isn't a general surrogate mother interpretation. So in paragraph 31, what it adds is, what does non-traditional mean? Okay. Well, let's say we take out that phrase. And so now it says, not specified as covered, non-traditional medical services, treatments, and supplies, which are not specified as covered under this plan, period. Right. Wouldn't you then have exactly the same argument about what paragraph 31 means that you do with that additional phrase? Well, two things. The first answer is yes, but the second answer is no. One of the things that I hope that this panel and this Court will understand from our position is this. We do not suggest that the interpretation proffered by Taltree and Mountain View is unreasonable. In fact, it's a very reasonable— Well, I get that. But I'm just trying to get—I mean, I understand that. You said that very well in your brief. But what I'm really—it's a very specific question. I'm not trying to pick on you, but I don't know. Let me ask you a different question. Let's say you said including but not limited to broken bones. Okay. Okay. Now, you still are going to have an argument that if there's a pregnancy charge for a natural mother or a surrogate mother, as long as it is a traditional medical service being offered to that mother, then that is covered, even if we change that last phrase to including but not limited to broken bones. Right? Right. Your argument is that that last clause actually means nothing. Well— You see what I'm asking? I understand the question that you're asking, and I'm hoping that what my response will be will be to get at it. Because we actually argued the inverse, that the interpretation proffered by them takes out significance from the word non-traditional. Because if you remove those two—if you remove that phrase, then it seems to have the exact same meaning, and non-traditional wouldn't have a meaning. What this is identifying—at least, this is what I think an ordinary reader would look at that and say, well, then what does this add? Well, this would suggest to someone who's receiving treatment and acting as a surrogate mother that they shouldn't be getting treatment that is non-traditional. And if they do, then it won't be covered. Because there's an—because they're now giving that example within that framework. I mean, I understand your question, but going back to the Hornbook definition of what an ambiguity is, is if a plan is subject to two reasonable interpretations, it's ambiguous. But it doesn't end there. Hornbook answers are very simple, but the nuance comes into play. So the meaning—or to give meaning to the phrase, including—and my screen went blank—but including pregnancy charges acting as a surrogate mother, we simply think that what that means is it is as a—it's simply— The surrogacy fee. A surrogacy fee. I'll give you a particular example. Let's say— Well, let's talk about a surrogacy fee, and I want to leave a little time for Judge Ide, too. But the fee for surrogacy is not something that the mother pays, correct? Well, I mean, can you conceive of a situation in which the mother would pay the surrogacy fee? Okay. So two things. If the question is about a surrogacy fee that— Well, I thought that's what you and Judge Bachrach were talking about. I thought that's what you were trying to say. Okay. If we're talking about some contract— Yeah, I am. No, this is what I'm looking at. There would be potentially different types of ways—  Well, I guess my question is— Just because I'd like to have a question and an answer, and then we can— And I apologize if I didn't answer your question, because— Because a surrogacy fee normally would be paid by the mother, correct? Would not be paid by the mother. Well, if there's a fee that's associated, it depends on who—on whom is the nature of the— You're playing with my head, aren't you? I'm not trying to. Look, let's say Jack wants to have a baby, but Jack's not married. So he goes to Jill and he says, Hey, Jill, I'll pay you if you carry a baby for me. And they strike the deal, right? Who's paying who? And under that circumstance, it would be very unlikely. But let me just give you a different situation. Let's say the surrogate mother is a relative. How about answering my question and then argue with me, okay? Well, I have about two minutes left, and so I want to be able to leave those two minutes to someone. Don't answer my question, that's fine. But you wanted to reserve how much time? The two minutes that I have left. Why don't we reserve your time? Because—but in response, very quickly, it's this. It does depend who the surrogate is. In your scenario, it would be unlikely. But in a situation where the surrogate was acting for a sister or a cousin, I can see any number of times where that mother would pay fees that otherwise you might think, No, they wouldn't. And I'll reserve the rest of my time. Thanks. May it please the court. My name is Scott Hagan. I'm arguing on behalf of all of the defendants' appellees in this matter. Your Honors, the plaintiff, Ms. Moon, did carry identical twin babies as a gestational carrier, as a surrogate mother. She's from Idaho Falls. It's where she was living and working and where Mountain View Hospital is located. The father, the adoptive father, wanted the baby born in Boise, so she actually went up to Boise to have some monitoring because these identical twin babies were in a situation where they each had an umbilical cord, but they were both together in one amniotic sac, so there's a heightened possibility of choking on the umbilical cord. So the adoptive father, the record shows at page 726, decided after consulting with medical professionals that the monitoring, that there should be monitoring, and he asked that that monitoring take place in Boise. So she is the surrogate, following his instructions, went up to Boise and received monitoring at that point. She submitted the claim to Taltree Administrators, the claims administrator for this benefit plan. And Taltree, when it realized, reviewing the medical record, that this was a surrogate pregnancy, denied the claim for the reason that surrogate expenses are excluded under the plan. And Taltree relied on exclusion number 31. It's already been discussed. Didn't rely on number 33. Right. Did not realize, well, the EOB says surrogate expenses are not covered. And so that's a specific reference to 31, but didn't specifically get into saying this is based on, quote unquote, exclusion 31. Well, just to be clear, the occupational exclusion. Right. You did not rely on that. Did not specifically cite it in the EOBs. Right. So Taltree relied on exclusion number 31, and that exclusion states, not specified as covered, non-traditional medical services, treatments, and supplies, which are not specified as covered under this plan, including but not limited to pregnancy charges acting as a surrogate mother. And this is a very clear and unambiguous exclusion. You can separate it into two parts. The first part is a description of the class, the general class of things that are not covered. And that class is non-traditional medical services, treatments, and supplies, which are not specified as covered under this plan. And then it really gives further clarification with the language that your honors were focusing on. And that is the example that the language is, pregnancy charges acting as a surrogate mother. Can I progress you a little bit on why your interpretation is so logical based on the grammar? So the last phrase, including but not limited to pregnancy charges acting as a surrogate mother, the word including suggests to me that what follows in that clause is going to be an example of something that is already identified, a noun clause. And so the noun clause that it's referring to is non-traditional, the adjective, medical services, treatments, and plans. Pregnancy charges is not a medical service, treatment, or supply. Do you understand what I'm asking? I do, but I think it's... There's a preposition that's missing. And this sentence just does not grammatically make sense to me. Well, your honor, I think that the example really clarifies it. And the example, every kind of a service that a medical plan pays for, every kind of benefit is going to be for a medical treatment, service, or supply. So that's just saying that non-traditional is really the word that matters in that general description. So we don't cover non-traditional medical care, basically. And then it gives the specific example. And you can go back and say, well, this could have been stated even more clearly than it was. But really, when you have an example like that, that specifically calls out a specific type of treatment, a specific type of care, that really makes it very clear and unambiguous. Well, counsel, can you just help me understand, though? Maybe you can just address opposing counsel's reading that non-traditional limits right off the bat. And there's a whole world of traditional services that should be covered. Well, you have to look at the language of the exclusion, your honor. And to read that into it, you have to actually add words to it. So they're, in effect, saying non-traditional medical services, treatments, and supplies, which are not specified as covered under this plan, including, but not limited to, non-traditional pregnancy charges, acting as a surrogate mother. You would have to add the words non-traditional in there to make that interpretation work. Well, I think their argument is, just from the get-go, the use of the word non-traditional, this is a very focused paragraph that only applies to non-traditional. So you wouldn't have to repeat the word non-traditional, because from the get-go, we're just talking about non-traditional services. But the other problem with that argument is that you also would have no need to have the words including, but not limited to, pregnancy charges acting as a surrogate mother, if you're just excluding non-traditional medical care. But the language is in there. And plaintiffs even cite a case that the test that they cite is that, quote, a contract should be interpreted as a whole, and all words, when possible, should be given their natural meaning. So the court's task here is to take the entire exclusion, read every word, and use every word in interpreting it to the extent possible. And I think if you interpret it in the way that we have suggested, where you take that initial description of the class as just a general statement of what's excluded, and then you have a specific example, pregnancy charges acting as a surrogate mother, it makes it very, very clear, as the district court found. Thank you. Let me just go to, and I think I've addressed the argument that plaintiffs have made regarding the interpretation of the clause. There are a couple of issues that I wanted to address. The first is whether the court should consider extrinsic evidence. And the answer is no, because in order to consider extrinsic evidence, which would include course of dealing, perhaps, it might include the court's application of the doctrine of contraproferentum. But you initially have to find that the exclusion is not clear and unambiguous. And for the reasons I've stated, it is clear and unambiguous. And in any event, if you look at the course of dealing, the record is very clear that in March of 2011, Ms. Moon called in to Taltry, talked to someone in the customer service department, and there's a record of that call that was kept, and it's in the record. And that call indicated that she was told, no, surrogate pregnancy expenses are not covered under your plan. Two years later, in 2013, she went ahead with a surrogate pregnancy anyway, submitted those charges to Taltry, and didn't say it was a surrogate pregnancy. There's nothing. Taltry denies that it knew that it was a surrogate pregnancy, and there's nothing in the record to suggest it was a surrogate pregnancy. No indication that Taltry could have known that it was a surrogate pregnancy in 2013. And so Taltry paid those expenses, but without knowing that it was a surrogate pregnancy, it didn't set some sort of a precedent as to what the plan covered. So in 2015, when it determined that this was a surrogate pregnancy, it immediately denied the charges. And finally, Ms. Moon also argues that the district judge had to specifically, in his oral ruling at the end of oral argument on the motions for summary judgment, had to specifically consider and reject alternative explanations as not reasonable. That's not a correct statement of the law, and she doesn't cite any case or other authority to support that proposition. The court just simply has to give a statement of the reasons for his decision. And in fact, if you look at the transcript of oral argument, you'll see that Judge Waddup specifically asked counsel, you know, I don't get your alternative explanation, sort of the same dialogue that has been taking place in this court. And the answer was given. And then Judge Waddup at the end gave a very reasoned and careful decision spanning over a couple of three pages of the record. Your Honors, if you don't have any questions, I think... It seems to me as a drafting proposition that there are various ways that the drafting of this exclusion could take place. And one, you could have a clause that says, uh, exclusions, this policy does not cover surrogate pregnancies, period. Because the question is what is insured under the policy? Right. And why wouldn't that be a... We're not here to judge the exam question at the bar, but why wouldn't that be a better way of... I think it clearly would be a better way. But I think the question before the court is not whether this could have been drafted more clearly, which I agree it could have been drafted more clearly, but it is absolutely clear and unambiguous. The meaning of this clause excludes, quote, pregnancy charges acting as a surrogate mother, close quote. Thank you very much, Your Honors. Thank you. Thank you. When I walked into this court, I had a burden. And in the court below, the defendants had a burden. And that burden was to show that the clause was unreasonable. And they didn't do that. Or if they did, Judge Watt observed by not explaining that. One of the things that the court really needed to do is in looking at this exclusion clause, to first find that the alternate offering, alternate interpretation was unreasonable. Secondly, because that's absent, we're working under the assumption that we have an argument that our interpretation is reasonable. Using that, this court should look at the exclusion clause and interpret it narrowly. There is meaning to the word non-traditional. And going back to the question of on page 783 of the record, that's where the phone call is, where Ms. Moon calls in 2011 and asks about surrogacy and is told no. Well, last weekend, I had to replace a refrigerator. And you know what? They waived the delivery fee. But you want to know what the first answer was to whether or not they would waive the delivery fee? It was no. But do you know what? I asked again when I got to the actual salesman. And the answer was yes. Claims are submitted both by participants and by providers. The more likely thing, when you look at these EOBs, they would have been claims submitted by a provider after she handed them an insurance card and says, I have insurance. Talltree had a duty. And when it covered those things, it says, yeah, we're covering these things. Yeah, we told you no in 2011. But it's yes. My time is done. So unless there are any other questions, I will see. Thank you, Your Honor. Thank you. Counselor, excuse. Thank you for your argument. Appreciate it.